IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

| | | |
|---|---|---|
| James Christopher Smith, | ) | C/A No.: 6:24-cv-06939-DCC-KFM |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **DEFENDANT'S MEMORANDUM** |
| | ) | **OF LAW IN SUPPORT OF** |
| Officer Torres, | ) | **DEFENDANT'S MOTION FOR** |
| | ) | **SUMMARY JUDGMENT** |
| Defendant. | ) | |
| | ) | |

The above-named Defendant, by and through undersigned counsel, respectfully submits the following Memorandum of Law in support of the Defendant's Motion for Summary Judgment.

## BACKGROUND

This suit arises from the arrest of the Plaintiff by the Defendant, who was a Deputy with the Greenville County Sheriff's Office at the time of the incident, for which Plaintiff has brought suit under 42 U.S.C. § 1983. Plaintiff initially brought suit alleging a bevvy of Constutional violations; by order of the Court, all of Plaintiff's claims have been dismissed, save for his Fourth Amendment claim of excessive force. Defendant in her Answer raised all relevant defenses, including the absence of any constitutional violation, qualified immunity, and Eleventh Amendment immunity.

## FACTS

The facts relevant to Defendant's Motion for Summary Judgment are clear, evinced by the footage from Defendant's body-worn-camera, incident report, and affidavit testimony.

On June 7, 2024, Defendant Alexis Torres, working at the time as a deputy with the Greenville County Sheriff's Office (hereinafter, "GCSO"), responded to her fellow deputies' reports of a stolen vehicle being pulled over at 419 Mauldin Road, in Greenville County, South Carolina. (Ex. 1, *Affidavit of Alexis Torres*: p. 1). Deputy Torres arrived on scene, where the suspect vehicle was parked at a gas pump, with multiple GCSO Plaintiff, who had been a passenger in the vehicle when it was pulled over, was placed in the back of a police vehicle until it was determined that he did not have any outstanding warrants. (Ex. 2, *Incident Report*: p. 2). Upon encountering the Plaintiff and the other passengers, Deputy Torres suspected that the Plaintiff and other passengers were under the influence of crack cocaine or some similar illegal drug, but this suspicion could not be confirmed with evidence amounting to probable cause. (Ex. 1, *Affidavit of Alexis Torres*: p. 2).

Having determined that Plaintiff had no outstanding warrants, he was released from custody on the scene. *Id*. At this point, Plaintiff became upset, and started loudly confronting Deputy Torres and other Deputies on the scene, demanding that he be allowed to leave with the vehicle. (Ex. 2, *Incident Report*: p. 2). Greenville County Sheriff's Office policy requires that a stolen vehicle be either impounded or returned to the registered owner. (Ex. 1, *Affidavit of Alexis Torres*: p. 2). Accordingly, Plaintiff was informed that he was allowed to leave, but that only the registered owner could take possession of the vehicle. Plaintiff became increasingly hostile and boisterous, cursing loudly in public. (Ex. 3, *Torres Body-Worn Camera Footage*: at 08:49:26 – 08:49:40). Subsequently, Plaintiff aggressively approached Deputy Torres and Deputy Woodall, who was in the process of speaking with the vehicle's owner, demanding that he be allowed to take the vehicle back to the owner, before exclaiming, "bullshit." *Id*. at 08:51:00 – 08:51:50.

Deputy Woodall and Deputy Torres then approached Plaintiff, who was sitting in the vehicle. *Id*. at 08:52:20 – 08:53:20. Deputy Woodall attempted to explain to Plaintiff that the vehicle's registered owner was going to be brought to the scene by a deputy so that she could take possession of the vehicle. *Id*. As Deputy Woodall spoke with Plaintiff, Plaintiff handed him his phone and allowed Deputy Woodall to speak with the vehicle's owner. *Id*. As Deputy Woodall attempted to explain to Plaintiff that a deputy had not yet met with the vehicle's owner to confirm that the vehicle wasn't stolen, and that therefore GCSO could only release the vehicle to the registered owner, Plaintiff continuously interrupted, screaming that he was being subjected to harassment and cursing loudly. *Id*. at 08:53:15 – 08:53:50. At this point, Deputy Torres informed Plaintiff that if he continued he would be arrested for public disorderly conduct. *Id*. at 08:53:50 – 08:53:55. Plaintiff then mockingly placed his hands out as if to be cuffed, and Deputy Torres approached Plaintiff in order to place him under arrest. *Id*. at 08:53:55 – 08:53:57. When Deputy Torres reached for Plaintiff's hand, Plaintiff pulled away and backed away, warning Deputy Torres, "don't touch me, don't touch me," and aggressively attempted to push Deputy Torres away. *Id*. at 08:53:57 – 08:53:58. As Deputy Torres continued to attempt to close the distance between herself and Plaintiff, while demanding that he turn around, Plaintiff continued to speak boisterously while backing up, again warning, "don't touch me!" *Id*. at 08:53:58 – 08:54:02. Plaintiff then warned Deputy Torres, "if y'all touch me, there's going to be a problem." *Id*. at 08:54:02 – 08:54:09. Plaintiff then fled from Deputy Torres, running across the street into an abandoned lot, where a fence prevented Plaintiff's further pursuit. *Id*. at 08:54:09 – 08:54:35.

When Deputy Torres caught up to Plaintiff, she demanded that he turn around. *Id*. at 08:54:35 – 08:54:38. In response, Plaintiff turned to face Deputy Torres, who then attempted to grab Plaintiff's hand, before swinging his arm away from Deputy Torres. *Id*. at 08:54:38 –

08:54:40. At this point, faced with Plaintiff's flight and continued combativeness, Deputy Torres delivered a strike to Plaintiff's left thigh with her baton. *Id*. Such a strike, properly delivered, stuns the leg, causing temporary numbness. (Ex. 1, *Affidavit of Alexis Torres*: p. 3). Deputy Torres had no immediate backup at the time she issued the strike, being alone in the abandoned lot with the Plaintiff, who had repeatedly threatened her and resisted her attempts peacefully detain him. *Id*. Deputy Torres noted as well that her decision was also influenced by her belief that the Plaintiff could likely overpower her. *Id*.

Once the strike was delivered, Plaintiff continued to argue before eventually allowing Deputy Torres to handcuff him. *Id*. No additional force was used against the Plaintiff; he was not placed on the ground, did not fall onto the ground, and Deputy Torres at no point delivered any knee strike to Plaintiff's back. *Id*.

## STANDARD OF REVIEW

Defendant Torres moves under Rule 56 of the Federal Rules of Civil Procedure for an Order Granting Summary Judgment. Rule 56 of the Federal Rules of Civil Procedure states that summary judgment is appropriate if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56.

"[A]t the summary judgment stage, the judge's function is not himself to weight the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The party moving for summary judgment bears the initial burden of establishing that there is "no genuine issue as to any material fact and that he is entitled to judgment as a matter of law." *Catawba Indian Tribe of South Carolina v. State of South Carolina*. 978 F.2d 1334, 1339 (4th Cir. 1992). However, once the moving party has met this burden, the non-moving party "may not rest upon the mere allegations

or denials" contained in the pleadings. *Lujan v. Nat'l Wildlife Federation*, 497 U.S. 871, 884 (1990). Rather, the non-moving party's response, "by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. *Id*. "The non-moving party must do more than simply show that there is some metaphysical doubt as to the material facts." *Catawba*, 978 F.2d at 1339 (quoting *Matsushita*, 475 U.S. at 586). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252.

The existence of certain "incontrovertible" evidence may constitute an "added wrinkle" in the summary judgment stage. *Scott v. Harris*, 550 U.S. 372, 378-80, 127 S. Ct. 1769 (2007). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment. *Scott*, 550 U.S. at 380.

## ARGUMENT

Defendant is entitled to summary judgment. First, Plaintiff was deprived of no constitutional right, where the force used by Deputy Torres in order to control and arrest the Plaintiff was reasonable, and minimally tailored to ensure the safety of Deputy Torres and of Plaintiff himself – the force was used only in response to Plaintiff's clear threat to Deputy Torres' safety and followed Plaintiff's ongoing belligerence. Additionally, even could Plaintiff show some constitutional deprivation, Defendant would nonetheless be entitled to qualified immunity, where no Supreme Court or Fourth Circuit jurisprudence has ruled that actions such as those taken by the Defendant were Constitutionally violative. Finally, Plaintiff is entitled to summary judgment

where she is immune under the Eleventh Amendment and where "Officer Torres," as contained in Plaintiff's pleadings, is not a person liable to suit under 42 U.S.C. §1983.

Plaintiff's claims are brought pursuant to 42 U.S.C. §1983. Section 1983 is not itself a source of substantive rights but merely provides a method for vindicating federal rights elsewhere conferred. *Albright v. Oliver*, 510 U.S. 266, 271, 114 S. Ct. 807, 811 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144, n.3, 99 S. Ct. 2689, 2694 (1979)). "The first step in any such claim is to identify the specific constitutional right allegedly infringed." *Id.* (citing *Graham v. Connor*, 490 U.S. 386, 394, 109 S. Ct. 1865, 1870 (1989), *Baker*, *supra*). "The essential elements to be proved in any section 1983 action are (1) that the defendant was acting under the color of state law in the actions complained of; and (2) that the defendant deprived plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States." *Clark v. Link*, 855 F.2d 156, 161 (4th Cir. 1988) (citing *Briley v. State of California*, 564 F.2d 849, 853 (9th Cir. 1977). "If there is no violation of a federal right, there is no basis for a section 1983 action and no answer to a plea by the public officer of qualified immunity." *Id.*

### 1. *Plaintiff was not subjected to excessive force.*

Deputy Torres is entitled to summary judgment as to Plaintiff's excessive force claim. "Our Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham v. Connor*, 490 U.S. 386, 396 (1989). "This right is obviously greater when the suspect is resisting arrest and refusing to comply with the officer's orders." *Terrell v. City of Spartanburg*, C/A No. 7:17-cv-02738-BHH-JDA, 2018 WL 4782334, at *5 (D.S.C. Sept. 12, 2018). However, "[t]he Fourth Amendment bars police officers from using *excessive* force to effectuate a seizure." *Yates v. Terry*, 817 F.3d 877, 884 (4th Cir. 2016) (emphasis added). "Courts

evaluate a claim of excessive force based on an 'objective reasonableness' standard." *Id*. (quoting Graham, 490 U.S. at 399). "Courts are to carefully balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id*. at 884-85 (citations and internal quotation marks omitted). Furthermore, the Supreme Court has stated,

> "Because the test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application, however, its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."

*Graham*, 490 U.S. at 396 (citing *Tenn. v. Garner*, 471 U.S. 1, 8-9 (1985)). The Court of Appeals for the Fourth Circuit has held that, among these factors, the second – whether the suspect poses an immediate threat to the safety of the officers or others – is "the most important." *Lewis v. Caraballo*, 98 F.4th 521, 531 (4th Cir. 2024).

"[T]he reasonableness inquiry in an excessive force case is an objective one: the question is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397. "An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional." *Id*. "The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id*. at 396. Additionally, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Id*. at 397; see *Stanton*, 25 F.4th at 233 ("In questioning the split-second decisions of

7

police officers, we must avoid hindsight bias and try to place ourselves in the heat of the moment."). Ultimately, "the question of whether the officer's actions were reasonable is a question of pure law." *Knibbs v. Momphard*, 30 F.4th 200, 214 (4th Cir. 2022); see *Scott v. Harris*, 550 U.S. 372, 381 n.8. (2007).

Turning to the *Graham* factors, Deputy Torres is clearly entitled to summary judgment where her use of force was minimal in light of Plaintiff's resistance and in light of the threat Plaintiff presented to Deputy Torres. Deputy Torres had clear probable cause to arrest the Plaintiff for Public Disorderly Conduct – indeed, the Court has dismissed Plaintiff's claims related to his wrongful arrest. To this end, Deputy Torres informed Plaintiff that he needed to calm down, that if he continued to curse and be boisterous, he would be subject to arrest. Plaintiff will certainly argue that public disorderly conduct is a misdemeanor; however, Deputy Torres would draw the court's attention to the video in this matter: it shows, in no uncertain light, that Plaintiff's disorderliness was not merely a nuisance to the public – it further worked to make law enforcement's job of investigating and controlling the incident scene more difficult. Accordingly, there was a manifest need to arrest Plaintiff.

To that end, the second and most important *Graham* factor, the threat to officer safety, weighs strongly in Deputy Torres' favor. Plaintiff, having been told that he was free to leave, had nonetheless refused, continuously screaming and cursing at the deputies present. Once Deputy Torres attempted to place him under arrest, he was immediately combative and threatening, demanding that Torres not touch him and stating that there would be a problem if she did. Once Torres caught up with the fleeing Plaintiff, he squared to face her and aggressively attempted to swipe her arm away. At this point, Deputy Torres did not have back up present; there was a clear need to effectuate Plaintiff's arrest, but his continued aggression made closing the distance

between them hazardous. Had Deputy Torres attempted again to close the distance between them, with Plaintiff cornered but still clearly resisting, she risked being overpowered. Such a situation presents obvious and manifest risks; if overpowered, Torres might have been assaulted herself by Plaintiff, or, in attempting to overcome being overpowered, might have attempted to use more lethal force, which again presents increased risk to both herself and Plaintiff. Accordingly, then, in order to safely be able to close the distance between the two and effectuate Plaintiff's arrest, Deputy Torres delivered a baton strike to Plaintiff's thigh. Such minimal force was clearly warranted by the dangers presented to Deputy Torres.

As to the third factor, it too weighs in Deputy Torres' favor. It is passingly clear that Plaintiff was attempting to flee at the time that the force was used. Deputy Torres had already been forced to pursue Plaintiff, alone, across a parking lot, five-lane road, and an abandoned lot before she used her baton to strike Plaintiff. Given Plaintiff's threats, ongoing defiance, and aggression towards law enforcement, it passes absurd to argue that Plaintiff was willing to be cuffed once Deputy Torres caught up with him; though cornered by a fence, Plaintiff continued to argue and defy Deputy Torres' orders. But for the baton strike, then, it is all but certain that Plaintiff would have continued his resistance and flight.

Accordingly, then, Deputy Torres' minimal use of force against Plaintiff was reasonable. Deputy Torres prays for an Order dismissing Plaintiff's claim for excessive force.

### 2. *Defendant is entitled to qualified immunity.*

Even could Plaintiff show some Constitutional deprivation, Defendant is nonetheless entitled to Qualified Immunity. In *Harlow v. Fitzgerald*, 457 U.S. 800 (1982), the Supreme Court held that government officials are shielded from liability in civil actions if their conduct does not violate clearly established statutory rights of which a reasonable person would have known. The

standard created in *Harlow* is an objective standard and is based upon the state of the law at the time of the alleged violation. The purpose of qualified immunity defense is to enable governmental officials to carry out their jobs free from the fear of civil liability for every mistake they may make, and to protect them from the "expenses of litigation, the diversion of official energy from pressing public issues and the deterrence of able citizens from acceptance of public office." *Harlow*, 457 U.S. at 814. That Court emphasized that:

> [G]overnment officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. Reliance on the objective reasonableness of an official's conduct, as measured by reference to clearly established law, should avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment.

*Id*. at 818.

Additionally, qualified immunity "provides ample protection to all but the plainly incompetent and those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1985). In *Anderson v. Creighton*, 483 U.S. 635, 640 (1987), the Supreme Court explained that in evaluating the defense of qualified immunity:

> The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates the right. That is not to say an official action is protected by qualified immunity unless the very action questioned has previously been held unlawful; but it is to say that in light of pre-existing law, the unlawfulness must be apparent. (Internal citations omitted).

*Id*. (see also *Dimeglio v. Haines*, 45 F.3d 790 (4th Cir. 1995)).

The Fourth Circuit Court of Appeals has also explained the rationale for the qualified immunity doctrine as set forth in *Harlow* as follows:

> The grant of qualified immunity to government officials ensures that these officials can perform their duties from the specter of endless and debilitating lawsuits. Without such an immunity, the operations of government would be immobilized. Permitting damages suits against government officials can entail substantial social

> costs, including the risk that fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties.

*Torchinsky v. Siwinsky*, 942 F.2d 257, 260-261 (4th Cir. 1991).

Granting a Defendant's motion for summary judgment is particularly appropriate in cases involving a qualified immunity defense, as the defense exists not merely to protect governmental officials from liability, but to protect them from trial. *Mitchell v. Forsythe*, 472 U.S. 511 (1985); *Turner v. Dammon*, 848 F.2d 440 (4th Cir. 1988). The Fourth Circuit has strongly espoused a preference for resolving civil rights cases involving qualified immunity short of trial, if possible. *Turner*, 848 F.2d at 444 (4th Cir. 1988). The Court in *Turner* also noted that qualified immunity entitles a defendant to dismissal unless there is an issue as to whether the defendant in fact committed a violation of a clearly established law. *Id*. at 443.

Therefore, to determine whether a defendant is entitled to qualified immunity in this case, the Court must make three determinations. First, the Court must identify the specific right allegedly violated by the defendant. Second, the Court must determine whether, at the time of the alleged violation, these rights were clearly established. Finally, the Court must determine whether a reasonable person in the defendant's position would have known that his actions were in violation of another person's rights. *Pritchett v. Alford*, 973 F.2d 307, 312 (4th Cir. 1992).

> The first two of these present pure questions of law for the courts. The third, which involves application of *Harlow*'s objective test to the particular conduct at issue, may require factual determinations respecting disputed aspects of that conduct.

> In determining whether the specific right allegedly violated was clearly established, the proper focus is not upon the right at its most general or abstract level, but at the level of its application to the specific conduct being challenged. And the determination whether a reasonable person in the officer's position would have known that his conduct would violate the right at issue must be made on the basis of information actually possessed by the officer at the critical time, or that was then reasonably available to him, and in light of any exigencies of time and circumstance that reasonably may have affected the officer's perceptions. The tolerance thus accorded by the qualified immunity defense to good faith mistakes of judgment

11

traceable to unsettled law, or faulty information, or contextual exigencies, is deliberately designed to give protection to all but the plainly incompetent or those who knowingly violate the law, in order to avoid undue inhibitions in the performance of official duties. (internal citations omitted).

*Pritchett*, 973 F.2d at 312-13.

In determining the right allegedly violated, "a court evaluating a claim of qualified immunity must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all." *Wilson v. Layne*, 526 U.S. 603, 609 (1999). Deciding this first issue can save a defendant from having "to engage in the expensive and time-consuming preparation to defend the suit on its merits." *Siegert v. Gilley*, 500 U.S. 226, 232 (1991). It "also promotes clarity in the legal standards for official conduct, to the benefit of both the officers and the general public." *Wilson*, 526 U.S. at 609 (citing *County of Sacramento v. Lewis*, 523 U.S. 833, 840-42 n.5, 140 L.Ed. 2d 1043, 118 S. Ct. 1708 (1998)).

In the present case, and as argued *supra*, Plaintiff was not denied any Constitutional right. Even assuming, *arguendo*, that such a violation occurred, though, no case law exists that would establish or support any theory under which the actions undertaken by Deputy Torres would have *clearly* violated the Plaintiff's rights. Referring to the arguments contained *supra*, Deputy Torres used the minimum amount of tailored force necessary to effectuate Plaintiff's arrest, in the face of a clear threat to her own safety. Indeed, Defendant can find no authority in the Fourth Circuit in which a baton strike has *ever* been found to be excessive force under Fourth Amendment.

Accordingly, then, Deputy Torres is entitled to qualified immunity.

### 3. *'Officer Torres' is not a 'person' liable to suit under 42 U.S.C. § 1983 and is entitled to Eleventh Amendment Immunity.*

Plaintiff has named "Officer Torres," as the sole Defendant in this matter, and complains only of actions taken by Deputy Torres in her official capacity as a Deputy of the Sheriff of

Greenville County. Section 1983 claims are premised upon the liability of "persons" acting within their individual capacity. *See Will v. Mich. Dep't. of State Police*, 491 U.S. 58 (1989). The Supreme Court has repeatedly held that states or state officials acting in their official capacities are not "persons" such as to be liable under 42 U.S.C. § 1983. *Will v. Mich. Dep't. of State Police*, 491 U.S. 58, 61 (1989). In the present case, Deputy Torres was on-duty working as a Deputy under the Sheriff of Greenville County, a Constitutional officer of the State of South Carolina. Plaintiff does not allege that Deputy Torres acted in her individual rather than official capacity; as such, she is not a person subject to suit under 42 U.S.C. § 1983.

Even were Defendant liable under § 1983, Plaintiff's claims must be dismissed against the Defendant sued in her official capacity because, pursuant to the Eleventh Amendment, she is an alter ego of the State of South Carolina and is not a "person" amendable to suit under 42 U.S.C. § 1983.Plaintiff brought this suit against the Defendant, listed as "officer Torres," in her official capacity. However, the Eleventh Amendment prohibits federal courts from entertaining an action against a state. *See, e.g.*, *Alabama v. Pugh*, 438 U.S. 781, 782, 98 S. Ct. 3057, 57 L. Ed. 2d 1114 (1978) (*per curiam*) (*citations omitted*); *Hans v. Louisiana*, 134 U.S. 1, 10-11, 10 S. Ct. 504, 33 L. Ed. 842 (1890). Further, Eleventh Amendment immunity "extends to 'arm[s] of the State,' including state agencies and state officers acting in their official capacity," *Cromer v. Brown*, 88 F.3d 1315, 1332 (4th Cir. 1996) (alteration in original) (internal citations omitted), because "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office . . . [and] is no different from a suit against the State itself." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) (internal citation omitted). Therefore, Eleventh Amendment immunity protects state agencies and state officials sued in their official capacity from liability for monetary damages under 42 U.S.C. § 1983. Id. The South Carolina Tort Claims Act

expressly provides that the State of South Carolina does not waive Eleventh Amendment immunity, consents to suit only in a court of the State of South Carolina. S.C. Code Ann. § 15-78-20(e). As a result, to the extent Plaintiff has alleged claims against the Defendant in her official capacity, those claims must be dismissed because a Defendant sued in their official capacity is entitled to immunity pursuant to the Eleventh Amendment.

## **CONCLUSION**

Therefore, for the foregoing reasons, Defendant prays for an Order granting summary judgment, and dismissing Plaintiff's claim with prejudice.

Respectfully submitted,

*s/ Charles F. Turner, Jr.*
Charles F. Turner, Jr. (Fed ID # 5489)
J. Nathan Ozmint (Fed ID # 14360)
Willson Jones Carter & Baxley, P.A.
325 Rocky Slope Road, Suite 201
Greenville, SC 29607
cfturner@wjcblaw.com
jnozmint@wjcblaw.com
(864) 672-3711

Attorneys for Defendant

Greenville, South Carolina
APRIL 21, 2025

14